UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:21-cr-40 |
| Plaintiff, | Hon. Robert J. Jonker |
| v. | Chief United States District Judge |
| CHRISTOPHER ALLAN BODEN, a/k/a "Captain," LEESA BETH VOGT, a/k/a "Lis Bokt," a/k/a "Moose," and DANIEL REYNOLD DEJAGER, a/k/a "Daniel Reynold," a/k/a "Daniel Miester," a/k/a "Danichi," | Hon. Phillip J. Green United States Magistrate Judge |
| Defendants. | |

_____/

# DEFENDANTS' JOINT MOTION TO DISMISS COUNTS 1–14 OF THE INDICTMENT AND BRIEF IN SUPPORT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

MOTION TO DISMISS COUNTS 1–14 OF THE INDICTMENT ............................................1

INTRODUCTION ...........................................................................................................2

BACKGROUND ............................................................................................................2

    The Geek Group .....................................................................................................2

    Bitcoin ...................................................................................................................3

    The Government's Investigation and Indictment ............................................................4

LEGAL STANDARD .....................................................................................................5

ARGUMENT ................................................................................................................5

    I.     Bitcoin is not "money" within the meaning of 18 U.S.C. § 1960 ........................5

          A.     The ordinary meanings of "money" and "funds" does not include bitcoin ..........................................................................................6

          B.     Bitcoin lacks the key indicia of money .....................................................8

          C.     Bitcoin is more appropriately viewed as personal property ....................10

    II.    The arm's-length sale of bitcoin is not "transmitting" money for purposes of 18 U.S.C. § 1960 .......................................................................................11

          A.     The plain language of § 1960 requires that money be transmitted to another person or place ........................................................................12

          B.     The legislative history of § 1960 affirms its plain language ....................15

CONCLUSION ...........................................................................................................17

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Clark v. Rameker*,
573 U.S. 122 (2014) ...........................................................................................................7

*Deutsche Bank National Trust Co. v. Tucker*,
621 F.3d 460 (6th Cir. 2010) ........................................................................................6, 12

*Donovan v. FirstCredit, Inc.*,
983 F.3d 246 (6th Cir. 2020) ........................................................................................8, 16

*Guzman v. U.S. Department of Homeland Security*,
679 F.3d 425 (6th Cir. 2012) ........................................................................................8, 16

*Kremen v. Cohen*,
337 F.3d 1024 (9th Cir. 2003) .....................................................................................10, 11

*Michigan Bell Telephone Co. v. Department of Treasury*,
518 N.W.2d 808 (Mich. 1994).........................................................................................11

*Nix v. Hedden*,
149 U.S. 304 (1893).......................................................................................................6, 7

*United States v. Banki*,
685 F.3d 99 (2d Cir. 2012) ...............................................................................................14

*United States v. Fitzgerald*,
366 F. Supp. 3d 936 (W.D. Mich. 2017)...........................................................................12

*United States v. National Dairy Products Corp.*,
372 U.S. 29 (1963)..............................................................................................................5

*United States v. Petix*,
No. 15-CR-227A, 2016 WL 7017919 (W.D.N.Y. Dec. 1, 2016).........................................7, 9

*United States v. Velastegui*,
199 F.3d 590 (2d Cir. 1999) .............................................................................................15

*Yates v. United States*,
574 U.S. 528 (2015).........................................................................................................14

## Statutes

18 U.S.C. § 1960............................................................................................................passim

<u>Page(s)</u>

U.C.C. § 1-103 ..................................................................................................8

U.C.C. § 1-201 ..................................................................................................8

**Rules**

Federal Rule of Criminal Procedure 12 ...........................................................5

**Other Authorities**

American Heritage Dictionary (2d ed 1982) ...................................................11

American Heritage Dictionary (5th ed. 2020) .................................................13

Bank of England, *The Economics of Digital Currencies*,
    2014 Quarterly Bulletin Q3 ......................................................................9, 10

Black's Law Dictionary (11th ed. 2019) .......................................................13, 14

Black's Law Dictionary (9th ed. 2009) ..........................................................7, 12

Jennifer R. Bagosy, *Controversial Currency: Accepting Bitcoin As Payment for Legal Fees*, Orange County Lawyer, June 2014 ..............................................10

Killian Steer, *Cryptocurrency Mining: The Challenges it Faces and How New Regulations Can Help*, 20 N.C.J.L. & Tech. Online 301 (2019) ...................11

Merriam-Webster (2021) ................................................................................8, 13

Saud Becirovic, *The Characteristics of Money and the Efficiency of Financial Markets* (2009) ...............................................................................................8, 9

## MOTION TO DISMISS COUNTS 1–14 OF THE INDICTMENT

Defendants Christopher Allan Boden, Leesa Beth Vogt, and Daniel Reynold DeJager respectfully move the Court to dismiss counts 1–14 of the Indictment in this matter for the reasons stated in the accompanying brief in support.

# INTRODUCTION

Defendants submit this Joint Brief in Support of their Motion to Dismiss Counts 1–14 of the Indictment.  Those counts ultimately rest on violations of 18 U.S.C. § 1960, which criminalizes the operation of an unlicensed money transmitting business.  However, the conduct alleged in the Indictment does not constitute "money transmitting" within the meaning of § 1960.  The counts should therefore be dismissed.

# BACKGROUND

The Indictment paints a startling picture of hardened criminals—"Moose," "The Captain," and "Danichi"—who ran a money transmitting and laundering operation in furtherance of a drug ring, profiting to the tune of hundreds of thousands of dollars.  (*See* ECF No. 1, PageID.1–9.)  The reality is far more pedestrian, and reveals the Government's overly expansive use of inapplicable statutes to punish members of a public-service nonprofit that sold bitcoin to the public to pay its mortgage and utilities and for community educational activities run out of the old YMCA on the west side of Grand Rapids.

**The Geek Group**

Christopher Boden founded The Geek Group in 1994.  The Geek Group was a 501(c)(3) nonprofit that sought "to provide opportunity for all people through programs designed to foster lifelong education, vocational access, and creativity in technology."  Guidestar, Geek Group Inc., https://web.archive.org/web/20180620203748/https://www.guidestar.org/profile/38-3600686 (last accessed July 8, 2021).  To that end, The Geek Group provided "hands-on access to traditional educational resources in a way that fits the modern life."  *Id.*  The Geek Group was one of just a handful of Grand Rapids nonprofits to receive the Guidestar Platinum Seal of Transparency in 2018.  *Id.*

Like many public-interest nonprofits, The Geek Group survived largely on meager membership dues and *ad hoc* donations from members and other third parties.  It also relied on money from its directors and managers.  Indeed, Defendants collectively contributed thousands of dollars of their own money to keep The Geek Group's mortgage paid and electricity on.

**Bitcoin**

Chris Boden first heard of bitcoin around 2011.  At the time, he paid little attention. Even when he heard that the value of bitcoin had skyrocketed, he still paid it little mind.  It was not until a friend told Chris that the blockchain—the distributed ledger technology that makes bitcoin possible—had solved a famed mathematics problem that Chris paid attention.

Chris then did what he always does when something captures his attention: he learned everything he could about it and offered to teach what he knew to anyone who would listen.  To that end, by 2017, The Geek Group hosted regular bitcoin classes open to the public.  In those classes, The Geek Group taught people the fundamentals of bitcoin and how to navigate the user-unfriendly process of purchasing and using it.

All this time, The Geek Group struggled to keep the lights on.  Each of the Defendants regularly poured their own money into keeping The Geek Group open to the public and fulfilling its purpose.

As the price of bitcoin increased, The Geek Group recognized an opportunity to keep itself afloat.  If The Geek Group could take some of the hassle out of buying bitcoin, it could charge a fee for doing so, and use that money to pay The Geek Group's bills.  From there, The Geek Group jumped head-first into selling Bitcoin.  It made no secret about its offerings, even placing a large Bitcoin logo on the front window and having front-desk staff members assist people in purchasing bitcoin for cash. (ECF No. 1, PageID.4.)

3

**The Government's Investigation and Indictment**

Eventually the Government caught wind of The Geek Group's open offer to sell bitcoin. The Government sent an undercover officer to visit The Geek Group and purchase bitcoin and, while doing so, mention that he sold cocaine.  The Government conducted its sting operation three times.

The Government's three purchases of bitcoin with simulated drug money ultimately form the basis for 17 of the Government's 28-count Indictment against Christopher Boden, Daniel DeJager, and Leesa Vogt.  (*See generally* ECF No. 1.)  Counts 1–14 of the Indictment, which Defendants seek to dismiss with the instant motion, charge the Defendants with various crimes relating to operating an "unlicensed money transmitting business" in violation of 18 U.S.C. § 1960.  Count 1 charges the Defendants with conspiracy to operate an unlicensed money transmitting business.  (*Id.* at PageID.1–4.)  Count 2 charges the Defendants with operating an unlicensed money transmitting business in violation of 18 U.S.C. § 1960, alleging that "at least some of the funds involved were used to purchase or derived from selling controlled substances." (*Id.* at PageID.5.)  Count 3 charges the Defendants with conspiracy to launder money (the underlying unlawful activity being operating an unlicensed money transmitting business). Counts 4–14 charge the Defendants with money laundering for transferring the proceeds from operating that alleged unlicensed money transmitting business.  Counts 15, 16, and 17 are also rooted in the Government's simulated drug money.  Those counts allege that the Defendants sold bitcoin for cash, affecting interstate commerce involving property represented by the Government to be the proceeds of the distribution of controlled substances.  (*See id.* at PageID.11–13.)

## LEGAL STANDARD

Federal Rule of Criminal Procedure 12 permits a court to dismiss an indictment or a portion of an indictment that fails to state an offense. FED. R. CRIM. P. 12(b)(3)(B)(v). When evaluating a defect in the indictment, the Court must accept the facts alleged in the indictment as true. *See United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 33 n.2 (1963).

## ARGUMENT

The government's theory regarding § 1960 is fundamentally flawed. The alleged "unlicensed money transmitting business" in this case was nothing more than the Defendants' arm's-length, two-party sales of bitcoins to customers. Even accepting all allegations in the Indictment as true for purposes of this Motion, the sales alleged are not "money transmitting" within the meaning of § 1960 for two reasons: First, bitcoin is not "*money*" within the meaning of § 1960, so transactions involving bitcoin are not transmitting "money" as required by the statute. Second, even if bitcoin is "money," the arm's-length sale of bitcoin to a customer, without more, is not "*transmitting*" money within the meaning of § 1960. Accordingly, the sales described in the Indictment were not governed by § 1960, and the Counts that depend on those sales (Counts 1–14) should be dismissed.

## I. Bitcoin is not "money" within the meaning of 18 U.S.C. § 1960.

Congress enacted 18 U.S.C. § 1960 to make it an offense for a business or an individual who transmits money from one place to another for a fee to do so without obtaining a license from the applicable state-licensing agency, or without registering with FinCEN. *See* 18 U.S.C. § 1960(b)(1)(A) & (B). As discussed in detail below, *see infra* Section II.B, Congress hoped to crack down on hawalas and other informal money transmitting businesses that transfer money

5

between the United States and foreign countries in a way that makes the money difficult to trace, and that preserves the anonymity of the person whose money is being transferred.

To that end, § 1960 begins with a simple prohibition: "Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both." 18 U.S.C. § 1960(a).  An "unlicensed money transmitting business" is any "money transmitting business" that meets one of three statutory triggers.  *See* 18 U.S.C. § 1960(b)(1). Before those statutory triggers become relevant, however, the Government must prove Defendant actually took part in a "money transmitting business."  18 U.S.C. § 1960(b)(1).

Section 1960 also defines "money transmitting":

> [T]he term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier.

*Id.* § 1960(b)(2).

The sale of bitcoin for cash is not "money transmitting" because bitcoin is not money as that term is ordinarily used.  Instead, bitcoin is more appropriately viewed as chattel—personal property—because it lacks the indicia of money as that term is ordinarily used.

## A.    The ordinary meanings of "money" and "funds" does not include bitcoin.

When § 1960 refers to the terms "money transmitting" and "transferring funds," the terms "money" and "funds" should be given their ordinary meaning.  *E.g.*, *Deutsche Bank Nat. Tr. Co. v. Tucker*, 621 F.3d 460, 462–63 (6th Cir. 2010); *see also Nix v. Hedden*, 149 U.S. 304, 307 (1893) (noting that "the common language of the people" has priority over technical definitions for purposes of statutory construction).

Dictionaries typically define the terms "money" and "funds" with reference to one another.  "Funds" means "[a] sum of money or other liquid assets established for a specific purpose." *Funds*, BLACK'S LAW DICTIONARY (9th ed. 2009); *see also*, *e.g.*, *Clark v. Rameker*, 573 U.S. 122, 127 (2014) ("The ordinary meaning of 'funds' is 'sums of money set aside for a specific purpose.'" (quoting AMERICAN HERITAGE DICTIONARY 712 (4th ed 2000) (internal alterations omitted))).  The definition of "money" is therefore key.  Money can be defined broadly or narrowly.  Black's defines "money" both ways.  The narrower is "[t]he medium of exchange authorized or adopted by a government as part of its currency; esp. domestic currency." *Money*, BLACK'S LAW DICTIONARY 1096 (9th ed. 2009).  The broader definition includes "[a]ssets that can be easily converted to cash."  *Id.*

The narrower definition best reflects the ordinary usage of the word "money."  At least one court that grappled with this question in the context of bitcoin and § 1960 recognized this fact:

> Across all of the legal authorities that make some reference to money, and despite new technologies that have emerged over the years within the United States monetary system, there has been a consistent understanding that money is not just any financial instrument or medium of exchange that people can devise on their own.  "Money," in its common use, is some kind of financial instrument or medium of exchange that is assessed value, made uniform, regulated, and protected *by sovereign power.*

*United States v. Petix*, No. 15-CR-227A, 2016 WL 7017919, at *4 (W.D.N.Y. Dec. 1, 2016).  Stated simply, "[o]rdinary people in everyday life know this [*i.e.*, that bitcoin is not money] intuitively; the average person who hears the term 'money' will think of government-issued 'dollars' or instruments, like checks, money orders, credit cards, or notes, directly connected to dollars."  *Id.* (citing *Nix*, 149 U.S. at 307).

The usage of the word "money" in other contexts supports this plain meaning.  For example, the Uniform Commercial Code defines money as "a medium of exchange currently authorized or adopted by a domestic or foreign government.  The term includes a monetary unit of account established by intergovernmental organization or by agreement between two or more countries."  U.C.C. § 1-201(b)(24).  To be sure, the U.C.C. does not control the use of the term "money" in § 1960.  But the U.C.C.'s widespread adoption and its purpose—to "simplify, clarify, and modernize the law governing commercial transactions, U.C.C. § 1-103(a)(1)—makes it a useful barometer of the ordinary usage for a broad, non-technical term like "money."

Moreover, the context of § 1960 demands the narrower of definition of money.  To define "money" for purposes of § 1960 so broadly as to cover all assets that can be converted to cash would render the statute so broad as to be meaningless.  That approach would yield the absurd result in which § 1960 would encompass the business of moving almost any item, and could make the transfer of any such items a felony offense in certain circumstances.  "Interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."  *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 254 (6th Cir. 2020) (quoting *Guzman v. U.S. Dep't of Homeland Sec.*, 679 F.3d 425, 432 (6th Cir. 2012)).  The broad definition of money does not apply to § 1960, and "money" should be given its ordinary meaning in everyday use.

### B.  Bitcoin lacks the key indicia of money.

Beyond ordinary usage, bitcoin lacks the critical characteristics of money as defined by economists.  Economists typically state that money has three irreducible characteristics: First, money is a medium of exchange; second, money is a unit of account; and third, money is a store of value.  *See, e.g.*, Saud Becirovic, *The Characteristics of Money and the Efficiency of Financial Markets* 1–2 (2009); *see also Money*, MERRIAM-WEBSTER (2021) (defining money as

"something generally accepted as a medium of exchange a measure of value, or means of payment").  Bitcoin is none of these things.

Bitcoin is not a generally accepted medium of exchange.  The term medium of exchange does not capture all items with which a person may barter for goods and services.  A true medium of exchange is ubiquitous.  It "enables the acquisition of *every kind of goods and services in the economy*."  Becirovic at 1 (emphasis added).  While bitcoin can be used to purchase various goods and services, its adoption is still so narrow that it cannot be considered a true "medium of exchange" within the economy.  Stated otherwise, "ordinary people do not receive salaries in bitcoins, cannot deposit them at their local banks, and cannot use them to pay bills."  *Petix*, 2016 WL 7017919, at *4.

Critically, bitcoin is also not a true unit of account.  "[T]o be a considered a true unit of account, [an asset] must be able—in principle, at least—to be used as a medium of exchange across a variety of transactions between several people and as such represents a form of co-ordination across society."  Bank of England, *The Economics of Digital Currencies*, 2014 Quarterly Bulletin Q3, 276, 279. When economists speak of a unit of account, they speak to money's ability "to measure value in the economy."  Becirovic 1.  In other words, to purchase goods "[w]e have to be able to assess the value of different goods," and money allows people "exactly [to] know the price of a certain good or service measured in money."  *Id.* at 1–2.  Even among sellers of goods or services that accept bitcoin for payment, the price of those goods and services will necessarily change along with the price of bitcoin relative to the dollar, to account for bitcoin's wild fluctuations in dollar value.  In other words, bitcoin is not used to represent the real value of an item.  It is simply an intermediary between the item and actual money—*i.e.* dollars—with which the item is being valued.  Indeed, "[t]here is little evidence of any digital

currency being used as a unit of account" because, despite its relevance in popular culture, bitcoin is still accepted by only a tiny fraction of vendors. Bank of England at 280.

Finally, Bitcoin is also not a true store of value. But because bitcoin is completely decentralized, its price is tied exclusively to private-market participants' view of the product instead of any governmental mechanism to stabilize price or value. Its valuation is therefore so volatile as to undermine its use as a true unit of account—there is no telling what a bitcoin will be worth tomorrow. *See, e.g.*, Jennifer R. Bagosy, *Controversial Currency: Accepting Bitcoin As Payment for Legal Fees*, ORANGE COUNTY LAWYER, June 2014, at 42 ("Bitcoin has other key features that make it very different from other methods of payment. First, the value of Bitcoin is highly volatile. In January 2013, one Bitcoin was worth about $13. By December 4, 2013, the price had skyrocketed to $1,061 per Bitcoin. By April 15, 2014, the value had dropped to $500 per Bitcoin." (citation omitted)).

Not only is bitcoin not "money" in ordinary usage, it lacks the critical indicia of money in economic terms. Accordingly, the sale of bitcoin is not "money transmitting" for purposes of § 1960. Sales of bitcoin therefore cannot render an organization an "unlicensed money transmitting business."

### C. Bitcoin is more appropriately viewed as personal property.

Bitcoin is personal property like any number of other tangible goods or intangible interests. While the legal definitions of property come from state law, those definitions illustrate that bitcoin is better analyzed as property as opposed to money.

One legal test for property requires three elements: "First, there must be an interest capable of precise definition; second, it must be capable of exclusive possession or control; and third, the putative owner must have established a legitimate claim to exclusivity." *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003) (analyzing core elements of property under

California common law).  Other courts look to broader dictionary definitions, which view property as "something tangible or intangible, visible or invisible, real or personal."  *E.g.*, *Michigan Bell Tel. Co. v. Dep't of Treas.*, 518 N.W.2d 808, 812 (Mich. 1994) (quoting *Property*, AMERICAN HERITAGE DICTIONARY (2d ed 1982)).

Unlike the three elements typically required for money (of which bitcoin has none), bitcoin has the core characteristics of personal property more generally.  First, an interest in bitcoin is capable of precise definition—at any given time, a user may claim ownership in a precise bitcoin because the blockchain permits all users to link specific bitcoins to a specific public address.  Killian Steer, *Cryptocurrency Mining: The Challenges it Faces and How New Regulations Can Help*, 20 N.C.J.L. & TECH. ONLINE 301, 306–08 (2019).  Second, a person's ownership interest in bitcoin capable of exclusive possession or control.  Bitcoin transactions require a private key; if a party attempts to conduct a transaction without the necessary private key, then the blockchain network that authenticates transactions will quickly identify that the transaction is invalid.  *See id.* at 307.  Finally, bitcoin owners can establish a legitimate claim to exclusivity.  In the same way a real property owner's claim to a plot of land is recorded with a register of deeds, the owner of bitcoin's claim to a bitcoin is recorded in the public ledger that is the blockchain.  *Cf. Kremen*, 337 F.3d at 1030 (recognizing that registering a website domain name is "like staking a claim to a plot of land at the title office").

The mechanics of bitcoin illustrate that it is not money, but simply a novel form of personal property.

## II.   The arm's-length sale of bitcoin is not "transmitting" money for purposes of 18 U.S.C. § 1960.

Even if bitcoin is considered "money" for purposes of § 1960, the statute is limited to "money *transmitting* businesses."  18 U.S.C. § 1960(a), (b)(2).  The plain text, statutory

structure, and legislative history of § 1960 all show that it is concerned with the transmission of money *from one place or person to another place or person*—not the arm's-length sale and purchase of a product as the Indictment alleges occurred here.

### A.   The plain language of § 1960 requires that money be transmitted to another person or place.

"When construing a federal statute, it is appropriate to assume that the ordinary meaning of the language that Congress employed accurately expresses its legislative purpose.  If the statutory language is unambiguous, the judicial inquiry is at an end, and the plain meaning of the text must be enforced."  *Deutsche Bank*, 621 F3d at 462–63 (internal citations and quotations omitted).  In other words, "[t]he language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear.  However, this court also looks to the language and design of the statute as a whole in interpreting the plain meaning of statutory language.  Finally, we may look to the legislative history of a statute if the statutory language is unclear."  *United States v. Fitzgerald*, 366 F. Supp. 3d 936, 938–39 (W.D. Mich. 2017), *aff'd* 906 F.3d 437 (6th Cir. 2018) (quotations and citations omitted).

Section 1960 prohibits unlicensed "money *transmitting* businesses."  *See* 18 U.S.C. § 1960(b)(2) (emphasis added).  The statute defines money transmitting as "includ[ing] *transferring* funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  *Id.* (emphasis added).

The key terms in this definition are "transmit" and "transfer."  The dictionary definitions of both terms illustrate that § 1960 does not apply to an arm's-length purchase and sale.  Black's Law Dictionary defines "transmit" as "[t]o send or transfer (a thing) from one person or place to another."  *Transmit*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Webster's

similarly defines the word as "to cause to pass from one to another."  *Transmit*, MERRIAM-
WEBSTER (2021).  Transfer has a similar definition to transmit: "To convey or remove from
one place or one person to another; to pass or hand over from one to another, esp. to change
over the possession or control of."  *Transfer*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see
also Transfer*, MERRIAM-WEBSTER (2021) ("[T]o convey or remove from one place, person,
etc., to another."); *Transfer*, AMERICAN HERITAGE DICTIONARY (5th ed. 2020) ("To convey or
cause to pass from one place, person, or thing to another.").

In both instances—"money transmitting" and the "transfer of funds"—the statute
speaks to the movement of money from one person to another person or place, not a
straightforward two-party purchase and sale of a product for cash.  The broader statutory
definition of "money transmitting" supports this ordinary reading.  Section 1960(b)(2) speaks
to "transfers within this country or to locations abroad."  The use of "within this country" and
"locations abroad" reinforces that the statute is aimed at transactions that move money from
one person to another *person or place*.  Moreover, the statutory definition lists several
potential methods of transmitting money to those other locations—"by wire, check, draft,
facsimile, or courier."  18 U.S.C. § 1960(b)(2).  Those examples clarify the type of behavior
the statute is aimed at: moving a customer's money to another *person or place*, not an arm's
length sale between two parties.  While the examples provided in the statute are not
exhaustive,[1] it would be wholly incongruous with the examples of "transferring funds . . . by
wire, check draft, facsimile, or courier" to include an arm's-length, two-party purchase and
sale that involves no movement of money to another person or place.  Instead, "a word is

---

[1]     The statutory definition notes that the examples are "including but not limited to transfers
within this country or to locations abroad by wire, check, draft, facsimile, or courier."  18 U.S.C.
§ 1960(b)(2).

known by the company it keeps." *Yates v. United States*, 574 U.S. 528, 543 (2015). This canon of statutory construction is necessary to avoid the situation the Government attempts here: "ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Id.* The list of examples Congress provided illustrates the manner of activity Congress regulated in § 1960: moving money from one person or place to another person or place. Critically, this is wholly consistent with the dictionary definitions of "transmit" and "transfer."

Other portions of § 1960 support this conclusion. Section 1960(b)(1)(C), for example, refers to the "*transportation or transmission* of funds." *Id.* at § 1960(b)(1)(C) (emphasis added). The use of *transportation* of funds illustrates Congress's concern with underground businesses that moved money from one person or place to another on its customers' behalf. After all, transportation means "[t]he movement of goods or persons from one place to another by a carrier." *Transportation*, BLACK'S LAW DICTIONARY (11th ed. 2019). "Transmission" of funds should therefore be viewed in the same context. *See Yates*, 574 US at 543 (recognizing the principle of *noscitur a sociis*—"a word is known by the company it keeps").

The Second Circuit has indirectly recognized that § 1960 is aimed at transactions that move money to a different person or place. *See United States v. Banki*, 685 F.3d 99, 111, 113 n.9 (2d Cir. 2012) (observing that a charge under § 1960 stating that a defendant's requested charge that "the business must transmit money *to a recipient in a place that the customer designates*, for a fee paid by the customer," was "legally correct"). The Second Circuit described the nature of a money transmitting business in plain language in another case involving § 1960:

> A money transmitting business receives money from a customer
> and then, for a fee paid by the customer, transmits that money to a
> recipient in a place that the customer designates, usually a foreign
> country. After the customer gives the money transmitter an

14

> amount to send to the designee, the transmitter notifies the "payer"
> with whom it has a contractual arrangement in the recipient
> country.  The payer then notifies the designated recipient of the
> money, and pays the money to the designee at the payer's office.
> The transmitter then remits to the payer the amount paid to the
> designee, plus the payer's commission.

*United States v. Velastegui*, 199 F.3d 590, 592 (2d Cir. 1999).

Section 1960's plain text requires the transfer or transmission of funds, which is akin to the movement of funds from one person or place to another—not an arm's-length, two-party transaction in which the buyer's money simply ends up with the seller.

### B.   The legislative history of § 1960 affirms its plain language.

While Section 1960's purpose is made clear by its plain text, the added context of its legislative history affirms the above-noted reading of the statute.

Section 1960 was first passed as part of the Housing and Community Development Act of 1992.  Pub. L. 102-550.  It originally prohibited only money transmitting businesses that were intentionally operated without a state license in a state that required such a license.  *See id.* § 1512.

Section 1960 changed substantially in the wake of the September 11th attacks.  As part of the USA PATRIOT Act, Congress sought to address a litany of national security issues, including the funding of terrorist networks by money sent abroad from the United States. Specifically, Congress targeted the use and operation of hawalas—businesses that transferred money abroad as a sort of informal Western Union—which were suspected of being employed to transfer money to al Qaeda.  In explaining the bill, Senator Levin noted that:

> Sections 359 [codified at 18 U.S.C. §§ 5312, 5330] and 373
> [codified at 18 U.S.C. § 1960] of the title deal with the underground
> banking systems such as the Hawala, which is suspected of being a
> channel used to finance the al Qaeda network.  Section 359 makes
> it clear that underground money transmitters are subject to the same
> record-keeping rules—and the same penalties for violating those

15

> rules—as above-ground, recognized, money transmitters.  It also directs the Secretary of the Treasury to report to Congress, within 1 year, on the need for additional legislation or regulatory controls relating to underground banking systems.  Section 373 clarifies that operators of money transmitter businesses can be prosecuted under Federal law for operating an illegal money transmitting business if they do not have a required State license.

S11051 Cong Rec.

The point here is not that § 1960 is limited only to hawalas.  The point is that the amendments to § 1960 were meant (as the statute's plain language makes clear) to prohibit the undocumented transfer of money *to another person or place*.

Because a two-party sale of bitcoin is not "money transmitting," the activity cannot constitute a "money transmitting business," and thus cannot constitute an "*unlicensed* money transmitting business" for purposes of § 1960.  Critically, this is true even if bitcoin is "money" for purposes of the statute.

The Government's expansive reading of "money transmitting" would yield untenable results.  Under the Government's view of the statute, the gas station attendant who exchanges a customer's five-dollar bill for five one-dollar bills is engaged in money transmitting.  Such an all-encompassing view of money transmitting would yield absurd results and is incongruous with § 1960's clear purpose.  It should therefore be rejected. *Donovan*, 983 F.3d at 254 ("Interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." (quoting *Guzman*, 679 F.3d at 432).

The Indictment in this case includes 14 counts that ultimately rest on violations of § 1960.  Count 1 is a charge for conspiracy to operate an unlicensed money transmitting business and Count 2 alleges that the Defendants operated an unlicensed money transmitting business.

Those charges rest ultimately on the two-party, arm's-length sales of bitcoin by the Defendants to customers.  (*See* ECF No. 1, PageID.1–5.)  From there, the Government charges the Defendants with conspiracy to launder money in Count 3 based on operating an unlicensed money transmitting business.  (*Id.* at PageID.6–8.)  Counts 4–14 allege money laundering by disposing of proceeds of an unlicensed money transmitting business.

But there was no unlicensed money transmitting business.  Indeed, there was no "money transmitting" at all.  All the Government has alleged are two-party, arm's-length transactions between Defendants and their customers.  The Government has alleged no *transmitting* of money—no request from customers to transmit funds to different places or to third parties, and no actual transmission by the Defendants.  Absent any allegations, the Defendants merely acted as *any retailer*—purchasing a product and selling it to members of the public for a fee.

## CONCLUSION

The Defendants respectfully request that the Court dismiss Counts 1–14 of the Indictment for the reasons stated above.

Dated: July 15, 2021

/s/ Brian P. Lennon
Brian P. Lennon (P 47361)
Paul H. Beach (P82036)
Warner Norcross + Judd LLP
150 Ottawa Avenue, NW, Suite 1500
Grand Rapids, MI 49503
(616) 752-2000
blennon@wnj.com
pbeach@wnj.com

*Attorneys for Defendant Christopher Boden*

Dated: July 15, 2021                  */s/ Brett A. Purtzer* (with permission)
                                      Brett A. Purtzer
                                      HESTER LAW GROUP, INC., P.S.
                                      1008 S. Yakima Avenue, Suite 302
                                      Tacoma, WA 98405
                                      (253) 272-2157

                                      *Attorneys for Defendant Daniel Reynold
                                      DeJager*


Dated: July 15, 2021                  */s/ Matthew G. Borgula* (with permission)
                                      Matthew G. Borgula (P57330)
                                      Laura J. Helderop (P82224)
                                      SPRINGSTEAD BARTISH BORGULA &
                                      LYNCH, PLLC
                                      60 Monroe Center NW, Suite 500
                                      Grand Rapids, MI 49503
                                      (616) 458-5500

                                      *Attorneys for Defendant Leesa Vogt*