UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                                              No. 1:21-cr-40

CHRISTOPHER ALLAN BODEN, a/k/a "Captain,"        HON. ROBERT J. JONKER
LEESA BETH VOGT, a/k/a "Lis Bokt,"                            Chief United States District Judge
a/k/a "Moose," and
DANIEL REYNOLD DEJAGER,
a/k/a "Daniel Reynold," a/k/a "Daniel Miester,"
a/k/a "Danichi,"

        Defendants.
_____/

## UNITED STATES' SENTENCING MEMORANDUM

The United States respectfully submits this sentencing memorandum as to each of the three defendants, as there is some overlap between the sentencing issues. The government addresses two scoring objections and the 18 U.S.C. § 3553(a) factors.

**I.    The Leadership Enhancements Should Reflect That There Were Five or More Participants in the Scheme.**

The presentence reports for Defendants Christopher Boden and Leesa Vogt score leadership enhancements, and both defendants acknowledge that a leadership enhancement applies. The government agrees with the probation officer that Boden is properly considered a leader and organizer, and that Vogt is properly considered a manager and supervisor. Among the facts supporting these conclusions are that Boden was the president and founder of The Geek Group, directed its employees, volunteers, and staff members, conceived of the unlicensed money transmitting business, actively participated in both the retail sales and the acquisition and money laundering of the bitcoin, and directed others as part of the scheme. Vogt was the

Executive Director of The Geek Group and its bookkeeper, developed the methods for structuring that allowed the unlicensed business to operate, and directed Jeremy Swink to deposit the cash proceeds of the bitcoin sales. She also personally deposited and structured the proceeds, and occasionally personally sold bitcoin.

The government respectfully objects to the scoring, however, insofar as it does not account for the fact that there were five or more participants in the scheme. Under the Guidelines, a "participant" need not be charged as a defendant. USSG § 3B1.1 n.1. The government has identified to defense counsel and the probation officer the identities and roles of a number of additional individuals who were involved in The Geek Group, including those who helped in the unlicensed money transmitting business, either by co-signing a bank account (and serving as an intermediary when the bank inquired into the structured deposits) or by conducting retail sales of bitcoin for The Geek Group or by advising Boden in the business. (*See, e.g.*, PageID.136–37, 377, 380.) Some of the Facebook records attached as Exhibit 1 also demonstrate the participation of others. *See, e.g.*, Ex. 1 at 26–36, 45–46.[1] Boden also states that The Geek Group had nearly 50 workers. (PageID.349.)

Because there were five or more participants, the government respectfully submits that Boden should receive the four-level increase of USSG § 3B1.1(a), which applies where the "criminal activity involved five or more participants," and Vogt should receive the three-level increase under USSG § 3B1.1(b), for managers or supervisors of such activity, rather than the two-level enhancement that applies to "any criminal activity other than described in (a) or (b)."

---

[1] The page numbers for Exhibits 1 and 2 refer to the pagination in the lower right corner.

## II. Vogt's Conduct Involved Proceeds of Unlawful Activity That Were Intended to Promote Unlawful Activity.

Vogt contends that she should not be assessed a two-level increase for structuring proceeds of unlawful activity or intending to promote unlawful activity because, in her view, operating a money transmitting business is not inherently unlawful (i.e., it can be appropriately licensed). (PageID.421.) This argument is legally and factually incorrect and contradicted by Vogt's sworn admissions in her plea agreement.

Section 2S1.3(b)(1)(A) provides for a two-level enhancement where "the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity." Under the plain language of the guideline, the enhancement applies here because the funds that Vogt structured were both proceeds of and intended to promote the unlicensed money transmitting business, which is unlawful activity about which Vogt knew. As part of the discussion below of the 18 U.S.C. § 3553(a) factors, the government summarizes the evidence that makes clear Vogt knew that the funds related to this unlawful activity (as noted below, there is also reason to believe Vogt knew about the money laundering, but the Court need not make that finding to apply the enhancement).

At least one court has rejected an argument similar to the one that Vogt appears to be making. In *United States v. Souza*, 749 F.3d 74 (1st Cir. 2014), the defendant argued "there was no evidence that he acquired funds through unlawful activity" because another party consented to the transaction in question and it did not involve fraud or misrepresentation. *Id.* at 86. The court rejected this argument, citing evidence that Souza did misrepresent the transaction and "promised illusory returns on the investment." Thus, the enhancement was proper. *Id.* Like Souza, Vogt's argument appears to be that some actions can be lawful, and therefore the enhancement should not apply where the activity could have, in a hypothetical world, been

lawful (in *Souza*, where the transaction had not involved fraud, or here, where the business had been licensed). But legally and factually, what matters is what happened, not what might have been.

Other courts have observed that this enhancement is fact-specific. *See United States v. Hill*, 171 F. App'x 815, 820–21 (11th Cir. 2006) (discussing *United States v. Vazquez*, 53 F.3d 1216 (11th Cir. 1995)) ("The district court found that, although it could not be certain of the source of the money, it did not believe the defendant's alternative story. On appeal, we determined that this factual finding was not clearly erroneous, explaining that the district court was entitled to infer that the defendant's false explanation was a cover for some type of criminal endeavor." (citations omitted)); *United States v. Larson*, 110 F.3d 620, 626–27 (8th Cir. 1997) (affirming application of the enhancement by finding that the defendant intended to promote a conspiracy); *United States v. Cooper*, No. 06-CR-35-LRR, 2007 WL 2076042, at *4 (N.D. Iowa July 18, 2007) (citing *United States v. Mitchell*, 31 F.3d 628, 633 (8th Cir. 1994)) ("The Eighth Circuit Court of Appeals has acknowledged that the illicit funds enhancement inquiry is a factual one.").

Vogt's plea agreement puts to rest any doubt about the facts that support this enhancement. Vogt was convicted of the structuring offense carrying enhanced penalties, and in doing so admitted the element of the offense that she structured "while violating another law of the United States or as part of a pattern of illegal activity." (PageID.175.) She admitted that she satisfied both of these alternative avenues to the enhanced statutory penalties—that is, the pattern of illegal activity, and also that she was "violating other laws of the United States, namely conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 371 and 1960, and operating an unlicensed money transmitting business, in violation of 18

4

U.S.C. § 1960." (PageID.176–77.) Thus, Vogt's plea agreement forecloses her ability to argue that she was not structuring proceeds of unlawful activity or intending to promote unlawful activity.

Therefore, the Court should overrule this objection on the basis of the plain language of the guideline, the case law cited above, the record evidence, and Vogt's admissions in her plea agreement.

### III. The Section 3553(a) Factors Favor a Sentence Within the Guidelines Range for Boden and Custodial Sentences for Vogt and DeJager.

The defendants submitted written statements to the probation officer for inclusion in the presentence reports. Boden's statement, and to a lesser extent Vogt's statement, attempt to minimize their own criminal culpability by misapprehending the nature of their crimes, minimizing their participation, advancing facts that are contradicted by the evidence, and blaming the government and others for their convictions. (PageID.343–55, 407.) The government here responds to some of these assertions for the Court's consideration in weighing the § 3553(a) factors.

#### A. Operating an Unlicensed Money Transmitting Business, Money Laundering, and Structuring are Serious Crimes.

Operating an unlicensed money transmitting business, and structuring proceeds to conceal and promote that money transmitting business, are serious offenses because they undermine the regulatory scheme of the Bank Secrecy Act. In large part to prevent money laundering, which both is and enables crime, the United States has a robust regulatory scheme, which importantly regulates the access points to the financial system. Critical components of this regulation are the requirements that financial institutions collect "know your customer" ("KYC") information, report certain activity (including large cash deposits) to the government, and implement anti-money-laundering controls. *See generally* FinCEN's Mandate From

Congress, https://www.fincen.gov/resources/fincens-mandate-congress#:~:text=The%20Currency%20and%20Foreign%20Transactions,detect%20and%20prevent%20money%20laundering (last visited Feb. 10, 2022); Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001, at 9–10 (May 9, 2019), *available at* https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf.  These elements of the American financial system not only help to combat crime but also provide an economic environment where lawful businesses can thrive and prosper.

Unlicensed money transmitting businesses like the one run by the defendants threaten this regime by providing access to the financial system that circumvents its controls, allowing crime to flourish and eroding the integrity of the financial system.  Unsurprisingly, unlicensed money transmitting businesses are often designed for precisely those reasons—to circumvent the banking system and to cater to criminals.  Although Boden and Vogt assert that their contravention of the law was a simple accident—either they didn't know what they were doing was wrong, or they knew it was but thought it wasn't a big deal—the evidence contradicts these claims.  They knew what they were doing was wrong, they did it anyway, and they welcomed customers who were involved in illegal activity.

### B.  Boden, Vogt, and DeJager All Knew They Were Committing Crimes.

First, the defendants were not "merely" operating an unlicensed business, Boden and Defendant Daniel DeJager were also laundering money.  Boden and DeJager mixed and tumbled the bitcoin to launder it; DeJager pled guilty to one of those counts, and Boden admitted to it in the factual basis of his plea agreement.  (PageID.199–200.)  In his statement regarding

6

acceptance of responsibility, Boden acknowledges that this conduct was designed to thwart anti-money-laundering controls—licensed exchanges would not sell them bitcoin if they determined that the defendants' customers were doing "something . . . illegal with it," so they mixed. (PageID.345.)  Boden held himself out as a money launderer, advertising that fact to customers on Facebook, and doing so in person to an undercover agent posing as a drug dealer.  *See, e.g.*, Ex. 1 at 1–5; Ex. 2 at 37–39.  Vogt may deny that she knew the details of the money laundering, but there is reason enough for the Court to be skeptical of such claims, given her marriage to Boden, her longtime position as Executive Director, the fact that she was in charge of The Geek Group's finances as its bookkeeper, and her direct involvement in setting up the system for moving money for the unlicensed money transmitting business and participation in retail bitcoin sales.  (PageID.405.)  Vogt also lied to agents on the day The Geek Group was searched, saying that though she was aware of Boden's Chase account, she did not pay attention to Boden's dealings in bitcoin.  (PageID.401.)  This attempt to distance herself from the money transmitting business tends to prove Vogt knew what she was doing was wrong.

Vogt asserts in her statement regarding acceptance of responsibility that she did not know structuring was a crime, and she structured because a certain PNC Bank employee, S.H., advised her to structure to avoid triggering the currency transaction report.  (PageID.407.)  Her "failing[]," in her view, was "never double checking what I was told."  (*Id.*)  Boden corroborates that claim, saying that his "friends in the banking world warned us about . . . never mak[ing] a deposit of more than ten thousand dollars."  (PageID.344.)  Based on the totality of the evidence of the offense conduct, the claim that the only reason they structured transactions is because S.H. told them to is dubious.  There is also specific evidence that contradicts it.

As noted in the government's response to the motion to dismiss, S.H. apparently inquired about the defendants' large cash deposits in August 2017. If S.H. had given them the guidance Vogt now claims, one might have expected that Boden and Vogt would have responded by indicating he had, in fact, told them to structure deposits in that way. Instead Boden's reaction to V.C., the co-signer of his "personal" PNC account, was as follows:

| | |
|---|---|
| V.C.: | just got a call from [S.H.] at PNC |
| . . . . | |
| V.C.: | he wants to know about the massive cash deposits going on in your account |
| . . . . | |
| V.C.: | money laundering, is what I told him |
| . . . . | |
| V.C.: | I actually told him noting [sic] |
| BODEN: | FUC K FUCK FUCK FUCK FUCK |
| . . . . | |
| V.C.: | [S.] will be calling you |
| BODEN: | [S.] is a great guy and a friend, we like him |
| V.C.: | he is still an officer of the bank |
| . . . . | |
| V.C.: | there was a big money laundering arrests around e-currency worldwide |
| BODEN: | ok, but we're not laundering money, lol |
| V.C. | of course not . . . I'll take your word for it |
| BODEN: | I sell bitcoin. |
| . . . . | |

8

| | | |
|---|---|---|
| V.C.: | | over 9k feds look at |
| BODEN: | | yes |

Ex. 1 at 26–29. Boden and Vogt conferred about the issue, with Boden confirming that most of the deposits were routed through the Chase account, not the PNC account:

| | | |
|---|---|---|
| BODEN: | | When we buy Bitcoin, does it go through my personal account, or on the separate thing we have for Danichi |
| VOGT: | | Usually it goes straight to the Chase account set up for him. |
| BODEN: | | ok |
| VOGT: | | [S.] pnc [phone number] |

*Id.* at 30. These are not the reactions one would expect if S.H. had in fact previously advised the defendants to structure their transactions.

The timing of these exchanges also undercuts Vogt's and Boden's claim. Even if S.H. advised Vogt and Boden to structure transactions after this exchange, these messages are from August 2017.[2] Months earlier, in their dealings with multiple financial institutions, it was clear that the defendants knew they were circumventing bank controls, they were trying to do so, and they knew it was wrong. Specifically, the defendants spent much of May and June 2017 trying

---

[2] There are messages in the Facebook records between Boden and S.H. suggesting that they met around this time and S.H. proposed some arrangement that they wanted to keep from the bank. *See* Ex. 1 at 31–36. For example, S.H. told Boden to tell Vogt not to "mention anything" to the "business banker," and S.H. opined that he could "get fired from pnc." Boden later suggested that they could "end up in bank prison for selling Bitcoin." *Id.* at 32–33, 35. Even if S.H. did advise Boden and Vogt to structure transactions, that is not a legal defense to the crime (that is, there is no "advice of banker" defense). Moreover, even if he offered that advice, it would be unreasonable for Boden and Vogt to rely on the advice of one bank employee they befriended and who indicated they should conceal whatever arrangement they had from other bank employees, all the more so because of the repeated indications from other financial institutions that the conduct they were engaged in was unlawful, as discussed below and elsewhere in the record. Relatedly, the defendants primarily used Chase Bank for their money transmitting business (though they also used PNC), and they do not aver that anyone at Chase advised them to structure.

9

to figure out how to transfer large sums of money without the banking system detecting and freezing the transfers.  For example, on May 30, 2017, Vogt wrote, "I just sent over 5.  I have some more to send but I didn't want it to be too big at once."  Later that day, she said, "I have another $2k waiting to go in to you, but I didn'T want to do a big one and flag something."  She wrote that she "did that remaining $2k as a google wallet payment."  She wrote, "for the next couple of smaller ones we'll try that and see if we can find its happy spot . . . . I enjoy the scientific method."  On May 31, she decried, "Damn banks!" before reporting that she "sent over 3.3k using a tried and true method" after she "managed to flag Chris' account today as fraudulent."  Vogt wrote that "the first time I did a couple of coinbase purchases on my own account I also flagged it."  On June 2, 2017, Vogt complained that she "sent over 5k and the banks were dumb and decided to hold it for a few days."  On June 3, she asked DeJager for permission to "send 4 over at one in google wallet, or would you prefer it in smaller pieces?"  She had to ask, she said, because she "[j]ust wanted to check before I did something The System didn't like," leading Boden to weigh in, "#fuckbanks."  On June 8, Vogt reported that "Google just cancelled my transaction."  She said, "Ive had a whole day of #FUCKBANKS but half of it was my fault."  The same day, she asked DeJager if he had received "an email from google asking to outline the transactions?"  On June 13, trying to send $7,500 "for safety" as Boden put it, Vogt wrote, "The super fun part is that I have to do it in pieces less than that because all of my methods cap me out under that, and that number ALSO varies depending on the phase of the moon."  Ex. 1 at 13–25.

      The government summarized additional Facebook messages indicative of the defendants' knowledge of their own wrongdoing in its response to the motion to dismiss.  (PageID.135–40.)  These include DeJager telling Vogt that he "worr[ies] about too many questions" from the bank

and Vogt responding "they don't really care . . . . they've never raised an eyebrow"; DeJager saying he "only worr[ies] about that magic 10k" and Boden responding in part, "we can't cross the line"; DeJager directing Vogt to break up cash that amounted to "exactly 10k"; all three defendants discussing banks flagging various accounts for fraud; Boden telling DeJager not to tell a cryptocurrency exchange what they were doing because "they would raise hell"; Boden and DeJager discussing whether DeJager had "cleaned" the bitcoin in the context of mixing; Boden telling customers that he sold "clean" bitcoin, which is "why people buy from me and not [Coinbase]" and that he could "anonymize" any bitcoin his customers already had; a person telling Boden to "[l]ook up title 31 section 5330" and that he had to register with the Treasury Department and record client information; and Boden telling DeJager that if he sells more than $1,000, "I'd better be damn sure they're not a fed." Ex. 1 at 1–18, 45–47.

In addition, Boden and Vogt's tax returns—jointly filed, even before they were married—indicate their knowledge of the wrongfulness of their conduct. Specifically, for tax year 2017, Boden and Vogt acknowledge that they did not report to the IRS the sales of bitcoin. (PageID.386.) They claim to have reported the sales in 2018, but the 2018 returns were filed after the search warrant was executed at The Geek Group, and in any event the claimed reporting occurred on a Schedule C that indicates the income was from "Consulting" and lists a code that corresponds to "Management, Scientific, and Technical Consulting Services." This Schedule C reports $15,200 in gross receipts and $14,547 in profits. In 2018, the defendants sold approximately $410,000 in bitcoin according to the records of cash deposits, and the evidence shows they routinely charged between 10% and 15% in commission. Therefore, the Schedule C neither accurately reports the nature or quantity of the income, and in any case was filed after the defendants knew about the government's investigation. Thus, the timing and the nature of the

11

disclosure do little to bolster Boden and Vogt's suggestions that they thought they were operating a legal business. Boden's assertion to the contrary in his statement to the probation officer regarding acceptance of responsibility is baffling. (PageID.345 ("Despite paying taxes on all of the bitcoin we bought and sold . . . .").)

Thus, the Facebook messages summarized above, and others, along with the failure to report these transactions to the IRS and the other offense conduct, undercut Boden's and Vogt's claims regarding their prior belief in the lawfulness of their conduct, their lack of knowledge of bank reporting requirements, and the reasonableness of the reliance on advice they supposedly received from a bank employee.

### C. Boden's Statement to the Probation Officer Denies His Criminal Responsibility and Blames the Government for His Prosecution, Making a Number of Claims that are Contradicted by the Evidence.

Boden's statement regarding acceptance of responsibility also advances several additional claims meriting a response. Boden makes various statements asserting that he either did not know he was doing anything wrong, or if he did, it wasn't serious. He likewise blames the government for its actions in response to his conduct. Boden writes, "I believed that if we were doing anything bad, . . . the worst that could happen is that a couple of guys would . . . tell us to stop doing that. . . . [T]hat's how the Government is supposed to work." (PageID.344.) Boden claims that the defendants "unintentionally" structured deposits because of the supposed "catch-22" between causing the bank to file the required currency transaction reports and committing a crime.[3] Boden distinguishes between the defendants' conduct and "[p]eople who actually do this on purpose in the real world." Boden is not one of the "bad guys doing bad

---

[3] This assertion ignores that there is nothing inherently illegal about the filing of the CTR—many law-abiding citizens have legitimate reasons to make cash deposits in amounts greater than $10,000, and do not worry about the deposits being reported to the government.

things," he says.  (Page ID.345.)  Boden "can get behind [the] idea" of "mak[ing] it harder for bad guys to fund . . . drug lords," apparently overlooking that he was caught on tape, multiple times, trying to help a person he believed to be a drug dealer move money.  (PageID.345.)  Boden writes that "the prosecution decided that mixing the bitcoin is a manner of 'Money Laundering,'" ignoring that DeJager pled guilty to that crime, and Boden himself admitted it was a crime in the factual basis of his plea agreement.  Boden continues that he "do[es] not want to imagine how many federal offenses we are all guilty of on a daily basis," and it is only by "luck and God's grace that all of my friends and I haven't already spent our entire lives in prison."  (PageID.346.)  Boden denies a profit motive, claiming "[t]he goal was simply to get Bitcoin into the hands of as many people as possible," (PageID.346), despite routinely charging customers a 10% to 15% mark-up, which as noted elsewhere, he said his customers would pay because unlike Coinbase, the bitcoin he sold was "clean."  *See* Ex. 1 at 3–5.  Boden says that it "turns out" what they were doing was illegal.  (PageID.344.)

A related theme in Boden's statement is that this prosecution is the government's fault.  "[T]he government disregarded . . . the blood, sweat, tears, time, and energy it took to build this science center . . . .  This could have been resolved with a simple conversation, but they didn't care. . . .  [T]hey spent staggering amounts of money and effort to lay siege to the building with an army."  (PageID.347.)  The government was "try[ing] [to] turn me into the Al Capone of Leonard St."  (*Id.*)  He writes that this prosecution is "foolishness" and that the Court should be "dealing with real problems that actually need this level of attention."  (PageID.354.)  He suggests that federal agents "get . . . much-needed lessons in logic, reason, and critical thinking."  (PageID.347.)  The government agents and prosecutors enforcing the law are "people who have no sense of humor, much less an understanding of cryptocurrency."  (PageID.344.)

But the commission of felonies—dozens of them, in Boden's case—is no laughing matter, and that Boden alludes to his prosecution as a joke in his statement regarding acceptance of responsibility indicates that important sentencing factors in his case will be "the need for the sentence imposed . . . to promote respect for the law, [and] . . . to afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(A), (B).  As noted above and in the government's response to the motion to dismiss, the Facebook evidence and recorded undercover deals make plain that Boden knew what he was doing was wrong, and even knew which provisions of the Bank Secrecy Act and regulations he was violating.  That he denies those facts in his statement regarding acceptance of responsibility is telling.  The defendants did not "simply" fail to get a license, or not realize they weren't supposed to structure transactions—though they knew both of those things were wrong—they also laundered money and Boden tried to collect a bitcoin debt through extortion.

In order to reach his conclusions about the insignificance of his own conduct, Boden also makes several claims that are contradicted by the evidence.  He says that "at our peak we were typically selling only a few grand in Bitcoin every week," below the $10,000 reporting requirement.  (PageID.344.)  But the banking records show that there were many weeks where they deposited more than $10,000.  For example, as alleged in the indictment in the structuring counts to which Vogt and Boden pled, in November 2017 and January 2018 the defendants moved more than $60,000 each month, or more than $15,000 each week.  (PageID.3.)  Even looking at the totality of the cash deposits—some $740,000 over approximately 90 weeks—shows that as a back-of-the-envelope calculation, the defendants were on average moving more than $8,000 each week, and given the irregularity of the business and the records of deposits themselves, it is clear that "at [their] peak" the defendants were easily doing more than $10,000

in business each week. They sold more than $10,000 to an undercover agent on three separate occasions, and Boden offered him an arrangement where he could sell $25,000 worth on a weekly basis. *See* Ex. 2 at 42.

Boden says that "[t]he actual amounts of money that are mentioned in the Government's case are rather insane, and largely because the prosecution holds as creative a grasp of mathematics as they do with pulling evidence and conversations out of context and perspective." Boden does nothing to explain how the government's "grasp of mathematics" is lacking or which amounts, supported by bank records furnished to Boden and the other defendants, are "insane," or which context—that he and his counsel are free to supply—is missing.[4] His claim that "what was actually happening was the same five-grand circling around over and over again," while perhaps attempting to reflect his perception that he never had significant sums of money in his possession at one time, misunderstands the evidence against him and simultaneously minimizes his own conduct. The government has never claimed that Boden had in his possession hundreds of thousands of dollars on a particular occasion. But the cash deposits are not fairly characterized as "the same five grand," as in each instance that cash came from new sales of bitcoin. And while Boden sets up a straw man by saying they "didn't even come close to crossing a million dollars in total transactions, much less the ten million I keep seeing reported online," (PageID.346), the fact remains that operating an unlicensed money transmitting business

---

[4] The government is aware of only one specific example where the defendants have argued that the government's summary of the evidence took a statement out of context. In the reply to the government's response to the motion to dismiss, the defendants argued that Boden's repeated exclamations of expletives—also quoted above—related to him forgetting to test a siren, and not the fact that a bank employee was inquiring into their illegal operation. (PageID.161.) Exhibit 1 includes the context of this particular discussion, and others, so each reader can resolve these issues for him or herself. In the case of the siren, the government submits that Boden's reaction seems more appropriately tailored to a criminal conspiracy being uncovered than an instance of forgetfulness.

that moves and launders hundreds of thousands of dollars a year is a significant operation and a serious crime.  By his own statements during the undercover operation, he would have continued to grow the business if it had not been shut down.  Ex. 2 at 37–39.

Boden's remarkable statement is also notable for what it doesn't address.  He doesn't discuss how part of his money-laundering operation involved loaning $100,000 to another person, which accrued to $500,000 after interest, according to his disclosures to the undercover agent.  Ex. 2 at 25–27.  Boden solicited the agent posing as a drug dealer to collect the debt for a commission.  We know Boden was serious about it, because he brought it up in two separate meetings with the agent, and of his own idea and volition delivered to the agent a dossier with everything he knew about the person, including his family.  *Id.* at 32–33, 45–47.  He authorized the agent to collect the debt by any means necessary short of murder.  Among the statements Boden made, excerpted in Exhibit 2:

- "If all I wanted to do was fuck him up, his head in burlap is easy to do.  I want my money.  I don't give a fuck about him; I don't give a fuck about his family.  I want my money."  Ex. 2 at 27.
- "I've got every phone number out of his cell phone, all of his contacts.  I got his driver's license, I got his Social Security card, I got everything on this dude.  I own him."  *Id.* at 30.
- "What happens to him, I don't give a shit . . . [Y]ou kill him, he ain't gonna pay me.  And, and I don't need him dead; he's dumb. . . . How you handle this, this is your world.  I care that I get my money back.  Beyond that, it's whatever's most efficient for you."  *Id.* at 51.

16

- "In my world, if I want to fuck someone up, I make an edit to LEIN or NCIC. . . . You edit that and you just put him as a escaped felon, escaped convict. . . . [I]n my world, you fuck a guy over, you make it so he can never buy a house, never buy a car, never have credit, never get a utility in his name." *Id.* at 52–54.

DeJager was present for one of these conversations. *Id.* at 28. DeJager told the government about an earlier meeting with the person where Boden threatened the person. (*See* PageID.405.)

Boden's statement to the probation officer also doesn't address his other statements to the undercover agent about supplying bitcoin. In the self-serving, unsworn statement, he now says that he "felt the hairs on my neck bristle" when he understood the agent to be a drug dealer, and only did the deal because he was so desperate for money, (PageID.353), but his words and actions at the time showed no discomfort. To the contrary, in addition to proposing the extortion, he made the following statements, and others, also excerpted in Exhibit 2 (DeJager was present for two of these deals, Ex. 2 at 7, 9, 18–19, 28):

- The undercover posing as a drug dealer was his "exact favorite kind of client," "guys . . . who . . . make[] a living out of knowing how to keep your mouth shut." Ex. 2 at 14–15.
- He told the agent that he did not collect KYC information: "Cash, no cards, no checks, I don't need your name, I don't need your ID." *Id.* at 2. He emphasized the point: "You can call me any time day or night, no bullshit. Like you just call me, I don't need your name, I don't need your ID, I don't need your address." *Id.* at 4. And a third time in the same transaction: "I don't need your ID or your name because you got cash." *Id.* at 5.

17

- "[W]hat I want to do is figure out how to be the bitcoin empire for you and everybody else in your world. I want to be the guy like that." *Id.* at 18–19.

- "I want to be your guy and I want to be your friend's guy and I want like, I want to get your world working on bitcoin." *Id.* at 39.

- "Like my total absolute max is about 25 a week unless I change my system . . . . I can go up to 25 a week without any problems." *Id.* at 42.

- "I deal with all the nickel and dime pot guys, like that's my world. . . . They come in here and they buy like a couple hundred bucks in bitcoin and they're doing their buys with that, and it's cool. And for like years, I've done this, I'm like, God, I wish I could meet some of the major players in this town who want to come in and buy like 15 grand a week and shit." *Id.* at 37–38.

The government concludes from Boden's statement to the probation officer and its contrast with his statements during the offense that he has no remorse for his actions, only remorse that he was caught. Boden should be sentenced accordingly within the Guidelines range.

### IV.   Conclusion

The government acknowledges that this is a unique case, and understands the probation officer's recommendations, as well as each defendant's request for a downward variance. But the government respectfully disagrees with the probation office's view that noncustodial sentences are warranted for Vogt and DeJager (as of this filing, the recommendation for Boden has not yet been filed). The Guidelines do not authorize a probationary sentence for any of these defendants, as each of their Guidelines ranges falls within Zone D of the sentencing table. USSG § 5B1.1(a) & n.2 ("Where the applicable guideline range is in Zone C or D of the Sentencing

Table . . . the guidelines do not authorize a sentence of probation."); *see* USSG § 5C1.1(f) ("If the applicable guideline range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment."); *id.* n.10 ("[T]he minimum term must be satisfied by a sentence of imprisonment without the use of any of the imprisonment substitutes in subsection (e)."). The conduct here provides no basis to deviate from the Guidelines in this respect: DeJager brazenly laundered money and facilitated transactions with the undercover agent posing as a drug dealer. At best, Vogt repeatedly structured deposits for a business she knew to be unlawful, that she enabled and participated in, as she set up the system to structure money back to DeJager, determined to evade the controls of the banking system. While DeJager has shown contrition, Boden and Vogt have not. The government requests that the Court impose appropriate sentences after weighing the 18 U.S.C. § 3553(a) factors for each defendant.

                                                            Respectfully submitted,

                                                            ANDREW BYERLY BIRGE
                                                            United States Attorney

Dated: February 10, 2022                 /s/ Justin M. Presant
                                                            JUSTIN M. PRESANT
                                                            Assistant United States Attorney
                                                            P.O. Box 208
                                                            Grand Rapids, MI 49501
                                                            (616) 456-2404
                                                            justin.presant@usdoj.gov