UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,                      Case No. 1:21-cr-40

v.                                     Hon. Robert J. Jonker
                                     Chief United States District Judge

LEESA BETH VOGT,

                Defendant.

_____/

**DEFENDANT LEESA VOGT'S MOTION FOR VARIANCE AND BRIEF IN SUPPORT**

On October 6, 2021, Defendant Leesa Vogt entered a guilty plea to one count of structuring, in violation of 31 U.S.C. § 5324(a)(3). This Court will sentence Ms. Vogt on February 17, 2022. United States Probation calculates Ms. Vogt's base offense level to be 23 and her criminal history category at I. Ms. Vogt's advisory guidelines range is currently calculated at 46 to 57 months' incarceration, and the Probation Officer who drafted the PSR recommends a sentence of two years probation with no incarceration. Due to nature and circumstances of the offense and characteristic of the defendant, including Ms. Vogt's lack of criminal history, and chronic medical ailments, Ms. Vogt respectfully requests that this Court follow the recommendation of U.S. Probation and sentence her to no more than a two-year term of probation.

**BACKGROUND**

As detailed in the presentence report (PSR), "the National Science Institute (NSI), previously known as The Geek Group (TGG), was a registered 501(c)(3) non-profit educational organization . . . with thousands of members around the world." (R. 77, PSR, PageID.393.) NSI "sought to provide opportunity for all persons through programs designed to foster lifelong learning, vocational access, and creativity in technology." (*Id.*) TGG originated as a result of its founding members' love of science and education. Like many non-profit organizations, TGG depended on membership dues and donations to stay afloat. In 2017, however, Christopher Boden, TGG's president and Ms. Vogt's husband, with the help of Daniel DeJager, began selling bitcoin to earn additional money for TGG.

Although Ms. Vogt was the executive director at TGG, she was not a board member of TGG and did not have a vote or decision-making authority like other board members. Her job primarily consisted of paying TGG's bills, running payroll, and making bank deposits. Other than hanging a sign in TGG's window advertising the sale of bitcoin and conducting a few small bitcoin transactions at the front desk, Ms. Vogt's involvement in the sale of bitcoin was small. The deposits Ms. Vogt made on behalf of TGG consisted of money from membership dues, donations made to TGG, and money from bitcoin sales. Other employees and volunteers at TGG also made deposits on behalf of TGG. The amount of money deposited during each transaction varied, and the frequency of deposits varied from week-to-week. However, when Ms. Vogt deposited money on behalf of TGG, she did so in amounts less than $10,000 to avoid the reporting requirement under the Currency and Foreign Transactions Reporting Act.

As Ms. Vogt now knows, federal law required that TGG obtain a license to operate a money transmitting business, and the manner in which TGG was conducting the sales of bitcoin on behalf of its members constituted a money transmitting business. In addition, she now knows that depositing money in increments less than $10,000 to avoid a reporting requirement is a crime.

Based on violations of the Bank Secrecy Act and other allegations of wrongdoing, federal agents executed a search warrant at TGG.  On or about February 24, 2021, a Grand Jury sitting in the Western District of Michigan returned a 28-count indictment against Christopher Boden, Ms. Vogt, and Daniel DeJager. On October 6, 2021, Ms. Vogt entered a guilty plea to Count 19 – one count of structuring – in violation of 31 U.S.C. § 5324(a)(3). The government dismissed the remaining charges against Ms. Vogt.

## ARGUMENT

As this Court is aware, when sentencing a defendant who has been found guilty of a crime, this Court must comply with the basic aims of sentencing set forth in 18 U.S.C. § 3553(a).  *Rita v. United States,* 127 S. Ct. 2456, 2463 (2007).  The Court should "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing.  18 U.S.C. § 3553(a); *United States v. Kimbrough*, 128 S. Ct. 558 (2007).  The goals of sentencing are "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," "to protect the public from further crimes of the defendant," and "to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A)-(D); *Kimbrough*, 128 S. Ct. at 569.  In *United States v. Ferguson,* 456 F.3d 660, 665 (6th Cir. 2006), the Court held that after *United States v. Booker*, 543 U.S. 220 (2005), a judge must impose the lowest sentence that is minimally sufficient to meet those goals regardless if that sentence is probation, time served, a mandatory minimum sentence, the statutory maximum sentence, or somewhere in between.

While courts must continue to consider the sentencing guidelines, they are no longer mandatory, and courts are only required to impose the least amount of imprisonment necessary to

accomplish the purposes of sentencing as set forth in 18 U.S.C. § 3553(a). Those factors include (a) the nature and circumstances of the offense and the history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwarranted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a). Here, Ms. Vogt asks that this Court consider the following 3553(a) factors, vary from the advisory guidelines range and sentence her to a two-year term of probation consistent with probation's recommendation.

## I. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant Merit a Downward Variance.

This Court may grant a downward variance, based on the nature and circumstances of the offense and the history and characteristics of the defendant. See, e.g., *United States v. Susany*, 893 F.3d 364, 369 (6th Cir. 2018) (court varied downward based on the nature and circumstances of the offense); *United States v. Musgrave*, 647 F. App'x 529, 537 (6th Cir. 2016) (court granted defendant's request for a downward variance based on the nature and circumstances of the offense, and on the history and characteristics of the defendant as a successful businessman, employer, work in the community, family support, and lack of criminal history.)

### A. Ms. Vogt's structuring offense is overshadowed by the positive impact that Ms. Vogt and TGG have had on the community.

Few citizens know that structuring deposits to avoid filing a currency transaction report is a crime. Indeed, it took an act of Congress to "fix" the Supreme Court's holding in *Ratzlaf v. United States*, 510 U.S. 135 (1994) that the government must prove that, like most Title 31

4

offenses, that the defendant knew that her conduct was illegal.  Shortly after *Ratzlaf*, Congress enacted the "*Ratzlaf* fix" and moved the penalty provision for all offenses in Title 31 Section 5324 to a new subsection, eliminating the willfulness requirement for those crimes, and "eas[ing] the government's burden" in its prosecution. See *United States v. Ismail*, 97 F.3d 50, 56 (4th Cir. 1996) (discussing the Razlaf fix to assist law enforcement by eliminating the willfulness requirement). As a result, individuals like Ms. Vogt can commit a criminal act if they knowingly avoid a currency transaction report by breaking up their cash deposits, which is what she did here.

Federal law enforcement officers take structuring very seriously. Department of Justice and Department of Treasury representatives around the country routinely host seminars for employees of financial institutions to educate those in the banking industry about the Bank Secrecy Act and explain what constitutes structuring and why it is an important tool for law enforcement officers to stop large scale criminal or terrorist organizations. In contrast, many bank tellers and low level bank employees view currency transaction reports as a job-related nuisance and do not understand that the federal government investigates structured transactions to determine if those transactions are designed to conceal other more serious criminal activity.

In this case, Ms. Vogt has acknowledged that at least one of the reasons she broke-up TGG deposits was to avoid the completion of a currency transaction report.  By doing so, she structured or attempted to structure her deposits in violation of the statute.[1] Her actions were not part of a larger criminal conspiracy to commit a fraud, drug crime or violent offense.  Her actions caused no harm to anyone or anything.  No one suffered a financial loss, and Ms. Vogt gained nothing

---

[1] Most of Ms. Vogt's structuring activity was "imperfect structuring" meaning it likely did not defeat the bank's obligation to complete the currency transaction report.  Further, while Ms. Vogt always intended to break up her transactions so that deposits were always under $10,000, TGG sometimes did not have that much cash on hand, making those structured deposits at worst an attempt to defeat an inapplicable reporting requirement.

other than perhaps the time it would take for her to wait while the bank completed the currency transaction report. She did not know the significance of her actions on the federal government's ability to uncover and investigate crimes.  Had she known how seriously the federal government would view her conduct, she never would have participated in this activity.  This Court should consider whether incarceration is an appropriate sanction for someone who unwittingly committed a federal crime for no financial gain and that caused no financial loss.

Further, the criminal activity in this case is overshadowed by TGG's positive influence in the community. Ms. Vogt shared in Chris Boden's dream to provide educational access and opportunities to people who may not otherwise have it. Mr. Boden filed his motion for variance with this Court and attached 53 exhibits for this Court to review; 52 of which were letters pertaining to Mr. Boden on a personal level, but also detailing the immense positive impact that TGG had on the community. As Mr. Boden's memorandum provided, TGG "'offer[ed] people a canvas to explore otherwise inaccessible dreams in a tech environment,' noted one former member who saw [TGG] as 'a flicker of light in a dark world.'" (R.81, Boden Motion, PageID.469). His memorandum further explained that TGG "provided that access by making '[t]ools and equipment . . . available for people to try doing things they'd never have an opportunity to attempt.' (Ex. 4, Kidwell Ltr.)." (*Id.*) While Ms. Vogt had no leadership authority at TGG, she worked closely with Mr. Boden, her husband, to ensure that TGG's influence could reach far and wide. She was part of TGG's extraordinary community. Mark Rokus, a member at TGG, described it as "a lot like the characters from Misfit Island from the show Rudolph the Red Nosed Reindeer. [They] all had an affinity for deep study in some area that sometimes left us perceived as less than socially well rounded . . . The organization provided an outlet for people that were deeply interested in technical things and felt marginalized in a world concerned with sports scores or what the latest pop star

was saying." (R.81-3, Exhibit 3, PageID.495.) Similarly, Paul Kidwell explained that TGG "not only worked to provide a venue for geeks and nerds to congregate, it also provided a place where people could learn. Tools and equipment were made available for people to try doing things that they'd never have an opportunity to attempt . . . [T]he organization grew to be an asset to the community at large." (R.81-4, Exhibit 4, PageID.497.)

TGG not only created a community and space for its "misfit" members, but it also strived to give back to the Grand Rapids community. TGG hosted a "computers, not candy" campaign that sought to provide laptops to impoverished students on the West Side of Grand Rapids, Michigan. According to Joshua Manalo, TGG gave "away THOUSANDS of laptops to poor kids on the west side of Grand Rapids FOR FREE [and TGG] open[ed] [its] doors to homeless during severe weather events." (R.81-8, Joshua Manalo Letter, PageID.510.) Likewise, TGG gave tours to interested groups. For example, "hundreds of kids, boy scouts, girl scouts, and community groups were treated to both tours and experiences at the facility that would encourage them to be curious about the world. Demonstrations were often put on to specifically get them excited about science." (R.81-10, Elizabeth Stack Letter, PageID.517.) TGG was not an organization that existed for a nefarious purpose; rather it operated on integrity, a love of learning, and true charity.

**B. Ms. Vogt is a law-abiding citizen who will never violate the law again.**

Ms. Vogt has no criminal history, has led an exemplary life, cooperated with law enforcement when they executed federal search warrants at TGG, and has accepted responsibility for her actions. Her friends also believe she is "not a future risk to the community." (Ex. A, Nichole Nadkarni Letter.) Now that Ms. Vogt knows that her actions were criminal, she wishes she had the power to travel back in time and do everything differently. As she indicated to probation, she "understand[s] that this is something that [she] will carry for the rest of [her] life," and she is

"frustrated and disappointed with [her]self." (R. 77, PSR, PageID.407.) She further explained that she is traumatized by this experience and has "learned a lot from this experience, and will never be in this situation again." (*Id.*) She understands she broke the law but asks this Court to consider the nature of the regulatory nature of the offense. Her actions did not involve violence or drugs; rather, she's before this Court because she was assisting in running a non-profit organization that ran afoul of banking regulations and money transmitting business licensing requirements.

While TGG closed following federal agents' raid in December 2018, Ms. Vogt's character and influence have remained strong. Ms. Vogt's friends consistently describe her as a caring, generous, intelligent, and hardworking person. For example, Edward Resor, a former full-time volunteer at TGG and friend of Ms. Vogt's, expressed that Ms. Vogt "has made a positive impact on many of those around her," and she has a "deep commitment to her friends and the Grand Rapids community." (Ex. B, Edward Resor Letter.) A prime example of Ms. Vogt's commitment to friends is her friendship with Ran Baumwollspinner, a man she met while in Israel in December 2019. They still keep in touch to this day, and he wrote a letter on her behalf for this Court to consider. In it, Mr. Baumwollspinner describes Ms. Vogt as "super intelligent . . . kind and modest." (Ex. C, Ran Baumwospinner Letter.) He knows her as a person who "open[s] her heart and house to everyone who is in need." (*Id.*) When Ms. Vogt's friend, Kathryn Christopher went through a divorce, Ms. Vogt provided support for her by offering her a place to stay and sent "comforting and encouraging" messages. (Ex. D, Kathryn Christopher Letter.) Another example of her selflessness is when she knew a friend was unable to pay a bill and she "simply sent the money they needed." (Ex. E, Steven Bellettini Letter.) While Ms. Vogt violated the law, she did so unknowingly and without any "malicious or nefarious" intent. (Ex. C, Kathryn Christopher Letter.) On behalf of Ms. Vogt, Kathryn Christopher asked this Court to consider the "context,

character, and intent" of Ms. Vogt and her actions so that "true justice [may] occur." (*Id.*) When talking to those that support Ms. Vogt, three words are a common refrain:  humble, caring, and generous. She is an incredible woman who dedicated the better part of her adult life to helping people whether it was to gain access to vocational opportunities at TGG, or simply helping her friends in their day-to-day lives.

Ms. Vogt also asks this Court to consider her medical history,  not only because it weighs the difficulties of housing her, but also because her ability to overcome chronic pain and suffering while maintaining a positive outlook on life reflects her true character.  It is no secret that Ms. Vogt has suffered and continues to suffer from numerous chronic illnesses. The PSR includes a list of current diagnoses and medications, the most serious of which are epilepsy, Ehlers-Danlos syndrome, Raynaud's phenomenon, lupus, chronic kidney stones, migraines, and polycystic ovarian syndrome. (R. 77, PSR, PageID.412.) She is also partly deaf. Ms. Vogt is prescribed at least 26 medications and vitamins to treat her various illnesses. Ms. Vogt's rheumatic conditions have worsened immensely over the past year[2], so her doctor referred her to the Cleveland Clinic in Cleveland, Ohio for appointments and diagnoses. (*Id.*) Despite her illnesses, however, she "remains so positive and so concerned for others. She spends her days going from doctor to doctor, traveling out of state for rare disease consults, and yet still finds a way to offer tender, loving friendship to those around her – even when those acts of kindness put her at risk of severe illness or complications from her medical issues." (Ex. F, Rebecca Takacs-Britz Letter.) Ms. Vogt asks this Court to consider her medical conditions when fashioning its sentence, not only because  Ms. Vogt's illnesses are likely so severe that it would be difficult for the BOP to provide adequate care

---

[2] Ms. Vogt's doctor recently prescribed her a new medication to treat her rheumatic illnesses. Thus far, it has worked wonders for Ms. Vogt, and she is optimistic that it will continue to help her.

and medications for her but because despite those illnesses she has continued to have a positive impact on those around her.

## II.   This Court Should Consider whether the Guidelines Overstate the Seriousness of Ms. Vogt's Criminal Conduct.

This Court may vary from the guidelines range if the guidelines overstate the seriousness of the offense, or on policy grounds.  *See, e.g, United States v. McBride*, 362 F.3d 360, 376 (6th Cir. 2004) (departing downward based on gross disparity between actual loss and the intended loss); *See United States v. Kamper*, 748 F.3d 728, 741-742 (6th Cir. 2014) (court committed procedural error when it misunderstood authority to disregard MDMA to marijuana ratio); *Spears v. United States*, 555 U.S. 261, 264 (2009) (courts may vary below guidelines on policy grounds).

Here, the guidelines are scored as a "base offense level is six plus the number of levels from the table in USSG 2B1.1 Theft, Property Destruction, and Fraud)," which in this case is six plus 14 levels, or a total of 20 offense levels.  By tethering the guidelines' range to loss in 2B1.1, the drafters of the guidelines sought to punish those who structured more proceeds of "Theft, Property Destruction, and Fraud" than others who caused less harm.  Ms. Vogt neither stole, destroyed property nor committed any fraud.  While it is not a requirement that the government prove that the structured funds were the proceeds of theft, property destruction or fraud, the absence of those criminal acts in this case causes the guidelines to be overstated. This Court should consider whether a variance to a level that does not include the 14-level enhancement for increased "loss" is a more accurate measure by which to determine the seriousness of Ms. Vogt's offense.

## CONCLUSION

In determining her sentence, Ms. Vogt requests that this honorable Court consider the seriousness of her offense, her acceptance of responsibility, character traits, support system, medical ailments, and her sincere resolve to never be in this predicament again. Ms. Vogt requests

a variance below the applicable guideline range and a term of probation as her sentence because it would be sufficient but not greater than necessary to comply with the purpose of sentencing enunciated by Congress in 18 U.S.C. § 3553(a).

Respectfully submitted,

Dated: February 10, 2022        /s/ Matthew G. Borgula
Matthew G. Borgula (P57330)
Laura J. Helderop (P82224)
SPRINGSTEAD BARTISH BORGULA & LYNCH, PLLC
60 Monroe Center NW, Suite 500
Grand Rapids, MI  49503